UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| MICHAEL H. BLACK, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 4:12 CV 1893 DDN |
| ) | |
| CAROLYN W. COLVIN,[1] ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff Michael H. Black for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401, et seq., and for supplemental security income under Title XVI of that Act, 42 U.S.C. §§ 1381, et seq. The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Doc. 10.) For the reasons set forth below, the decision of the Administrative Law Judge is affirmed.

## I. BACKGROUND

Plaintiff Michael H. Black, born on July 5, 1962, filed applications for Title II and Title XVI benefits on March 22 and 31, 2011. (Tr. 108-17.) He alleged an onset date of disability of September 12, 2010, due to arthritis and gout in the right knee, numbness of the left foot, pain with sitting, arthritis of the right hand and knee, pain in the left foot and

---

[1] On February 14, 2013, Carolyn W. Colvin became the Acting Commissioner of Social Security. The court hereby substitutes Carolyn W. Colvin as defendant in her official capacity. Fed. R. Civ. P. 25(d).

low back, and high blood pressure. (Tr. 137.) Plaintiff's applications were denied initially on June 8, 2011, and he requested a hearing before an ALJ. (Tr. 45-54.)

On June 27, 2012, following a hearing, the ALJ found plaintiff not disabled. (Tr. 10-18.) On August 20, 2012, the Appeals Council denied plaintiff's request for review. (Tr. 1-6.) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II. MEDICAL HISTORY

On October 14, 2010, plaintiff met with Teresita Cometa, M.D., to refill his medication for hypertension. Dr. Cometa prescribed a three-month prescription for triamterene-hydrochlorothiazid and Norvasac.[2] (Tr. 206-07.)

On November 9, 2010, plaintiff complained of right knee swelling that began one month earlier. Terri C. Coble, M.D. assessed continued hypertension and arthropathy of multiple sites in the right knee.[3] A right knee X-ray revealed a probable old rupture with degeneration of the medial meniscus and degenerative osteoarthritis with calcified loose bodies. Dr Coble instructed plaintiff to return to discuss the X-ray. (Tr. 205-08.)

On January 6, 2011, plaintiff returned to Dr. Coble to discuss his lab results and X-ray. Plaintiff complained of significant knee pain and difficulty walking distances. Plaintiff rated his pain level at 5 out of 10. Dr. Coble noticed tenderness on the inner-side of the knee. Dr. Coble recommended a low-fat diet and referred plaintiff for an orthopedic evaluation. (Tr. 203-04.)

On January 26, 2011, plaintiff was seen at the Smiley Urgent Care Center and complained of pain in his right knee stemming from an injury on the stairs four days prior. Myung Kang, M.D., found plaintiff's X-ray revealed minimal degenerative joint disease. Dr. Bala Vittal Varanasi diagnosed hypertension, arthritis, and osteoarthritis and noted that he could not exclude gout as a potential diagnosis. He administered an

---

[2] Triamterene-hydrochlorothiazid and Norvasc are used to treat high blood pressure. WebMD, http://www.webmd.com/drugs (last visited on May 24, 2013).

[3] Arthropathy is a term used to describe a disease affecting a joint. Stedman's Medical Dictionary, 161 (28th ed., Lippincott Williams & Wilkins 2006) ("Stedman").

intramuscular injection of ketorolac tromethamine.[4] He also prescribed Indomethacin, Ranitidine, Tramadol, and acetaminophen.[5] Plaintiff was fitted for crutches and given an Ace wrap with instructions. Plaintiff stated he felt better upon discharge. (Tr. 215-21.)

On April 7, 2011, plaintiff visited Dr. Coble to follow-up on his hypertension and degenerative joint disease on his right knee. Dr. Coble advised plaintiff to attend his orthopedic appointment on April 11, 2011 and to continue with his medication. (Tr. 201-202.)

On April 11, 2011, David Kieffer, M.D., examined plaintiff in relation to a complaint of right knee pain lasting six months or more. Dr. Kieffer diagnosed plaintiff with osteoarthritis of the knee and administered a corticosteroid injection into the right knee. Plaintiff was to follow up in three months. (Tr. 213-14.)

On April 15, 2011, Dr. Coble submitted a Medical Source Statement – Physical form regarding the physical capabilities of the plaintiff. She found plaintiff could lift or carry frequently five pounds up to two-thirds of a typical 8-hour day, stand or walk less than fifteen minutes continuously without a break, stand or walk less than one hour, sit continuously without a break for fifteen minutes, and sit for less than one hour total. She also found plaintiff could not operate foot controls, should never balance, stoop, kneel, crouch, or crawl, but he could occasionally climb. She found that plaintiff could frequently reach, handle, finger, feel, see, speak, hear, and did not need an assistive device for ambulation or balance. She found plaintiff should avoid any exposure to extreme cold or wetness/humidity, avoid moderate exposure to extreme heat, weather, and heights, and avoid concentrated exposure to dust/fumes, vibration, and hazards. She

---

[4] Ketorolac is used for the short-term treatment of moderate to severe pain in adults. Tromethamine is used to treat excess body acid. WebMD, http://www.webmd.com/drugs (last visited on May 24, 2013).

[5] Indomethacin is used to relieve pain, swelling, and joint stiffness caused by arthritis, gout, bursitis, and tendonitis. Ranitidine is used to treat and prevent heartburn. Tramadol is used to relieve moderate to moderately severe pain. WebMD, http://www.webmd.com/drugs (last visited on May 24, 2013).

found plaintiff should lie down three times a day for fifteen to twenty minutes each. Lastly, she found plaintiff's pain caused decreased persistence and pace. (Tr. 225-26.)

On May 11, 2011, plaintiff arrived at urgent care by wheelchair complaining of a broken little toe on his left foot caused by hitting his foot on the couch. He mentioned his left leg sustained a gunshot in 1993, causing drop left foot.[6] X-rays showed a fracture of the fifth metatarsal on the left foot. Emilio Bianchi, P.A., applied a splint and cast to the left foot, instructed plaintiff to use crutches, and prescribed Tramadol for pain. He advised plaintiff to refrain from bearing weight on his left foot and to see an orthopedist. (Tr. 300-02.)

On June 2, 2011, plaintiff went to the emergency room complaining of right posterior shoulder pain. Martin A. Docherty, M.D., examined plaintiff, and gave him a prescription for a Hydrocodone, cyclobenzaprine, and Naproxen.[7] Dr. Docherty diagnosed a right shoulder strain. Plaintiff was released the same day. (Tr. 233-50.)

On June 6, 2011, plaintiff met with Dr. Kieffer about his broken toe and left foot. Dr. Kieffer assessed osteoarthritis in the right knee and metatarsal fracture. He injected corticosteroids into plaintiff's right knee. He instructed plaintiff to follow up in three months and to perform exercises as prescribed. (Tr. 231-32.)

On July 29, 2011, plaintiff met with Dr. Coble. Plaintiff stated the steroid injection from Dr. Kieffer afforded him some relief. Dr. Coble assessed hypertension, hyperlipidemia and arthropathy on multiple sites in the right knee.[8] (Tr. 229-30.)

---

[6] Foot drop, sometimes called "drop foot," is the inability to lift the front part of the foot, which causes the toes to drag along the ground while walking. http://www.webmd.com/a-to-z-guides/foot-drop-causes-symptoms-treatments (last visited on May 24, 2013).

[7] Hydrocodone is used to treat symptoms caused by the common cold, flu, allergies, hay fever, or other breathing illnesses. Cyclobenzaprine is used short-term to treat muscle spasms. Naproxen is used to relieve pain. WebMD, http://www.webmd.com/drugs (last visited on May 24, 2013).

[8] Hyperlipidemia is the elevation of lipids in blood plasma. Stedman at 922.

- 4 -

On March 15, 2012, plaintiff saw Dr. Coble to refill his prescriptions and get a referral for his knee problems. Plaintiff reported he had no pain. Dr. Coble assessed hypertension and hyperlipidemia. (Tr. 227-28.)

On April 14, 2012, plaintiff met with Robert Taxman, M.D., and complained of hand stiffness and right shoulder pain that radiated to his neck and right arm. Plaintiff requested an additional steroid injection for his right knee. Dr. Taxman found that plaintiff's X-ray revealed minimal degenerative joint disease as well as densities throughout the shoulder. Dr. Taxman diagnosed acute pain in the right shoulder and chronic pain in the right knee due to osteoarthritis. He injected Toradol into plaintiff's right arm, and placed it into a sling. (Tr. 284-90.)

**Testimony at the Hearing**

The ALJ conducted a hearing on June 12, 2012. (Tr. 24-38.) Plaintiff testified to the following. He is 49 years old and completed tenth grade. He lives with his wife and two daughters, ages eighteen and twenty-one. (Tr. 24, 32.)

He worked as a meat cutter from 1999 to 2004. He worked as a maintenance worker at a mental hospital from 2004 to 2008. At the mental hospital, he stripped and buffed floors and cleaned bedrooms and bathrooms with a buffing machine. He last worked as a meat cutter from 2009 to 2010. His employer terminated him because the swelling in his knee made him unable to perform his duties. Subsequently, he received unemployment benefits for about two months. (Tr. 25-27.)

He has high blood pressure but takes medication that controls it. His right knee has no cartilage, and he receives steroid injections every three months. He has suffered constant pain in his right knee for the past year and a half. Although he requires a knee replacement, he does not have insurance. His knee last underwent testing about April of last year at Connect Care. He went to Connect Care because his arm sometimes "got stuck". The condition clears up after two to three weeks. He received a prescription and instructions to obtain therapy. (Tr. 27-29.)

He fractured his toe in 2011, which eventually healed. He has had a dropped left foot since 1993 which affected his past work due to blood rushing to his toes. To facilitate blood circulation, after sitting for about twenty minutes, he removes his shoe or elevates his foot on a chair. It has increased in severity since he stopped working. He elevates his legs for about an hour five or six times per day. He cannot move his foot up and down, and the foot drops without his shoe. He has difficulty walking and removing himself from his bed. His wife wiggles his legs to help blood circulation. Sometimes, his legs give out from under him. (Tr. 28-29, 31.)

He can stand for about an hour and a half before pain shoots through his leg, into the lower part of his back, which causes him to be unable to stand straight. To regain the ability to stand straight, he must lie down and elevate both of his legs. He can walk one block, but he must elevate his leg afterwards due to swelling. He also suffers pain and swelling in his left knee, which may also require knee replacement surgery. He cannot squat, and, if he drops an object, he requires a family member's assistance. Although he received instructions to avoid climbing, he can climb stairs with the help of a rail. The pain in his right knee puts pressure on his left knee, which causes pain in the left knee. (Tr. 29-30.)

His shoulder bothered him for the past three to four months. One morning, he awoke to find himself unable to raise his right arm. He saw a doctor who instructed him to run hot water on his shoulder and will see Dr. Coleman soon for therapy. His doctor told him that throwing meat boxes on his shoulder caused the injury. He also has arthritis in his right hand that causes swelling and a locked wrist. (Tr. 31-32.)

His average day consists of watching television and walking to keep blood circulating through his legs. He tries to stay off of his knee because the joints rub together, which causes the bones to splinter. He mainly walks to use the restroom. He sometimes goes shopping with his wife, but he typically stays in the car while she shops. Although he once performed yard work, he no longer does so due to his knee. He can no longer cut meat or play softball because of his knee. He does not cook at home. (Tr. 33-34.)

He does not have medical insurance, and he has trouble affording treatments and medications. He takes muscle relaxers for his legs and hands but alleviate only his pain and cause dizziness. (Tr. 32.)

He can lift no more than fifteen pounds. His grandson weighs about fifteen pounds, and plaintiff can hold him for five to ten minutes. Plaintiff told Dr. Coble that he could only lift 5 pounds because his legs hurt worse at that time. He can stand and walk less than an hour during an 8-hour workday. He can sit for only an hour due to his dropped foot. (Tr. 34-35.)

Vocational expert (VE) Gerald Belchick also testified at the hearing. The ALJ asked hypothetically if an individual aged 48 with ten years of education, who can lift twenty pounds occasionally and ten pounds frequently, stand, walk, or sit for six hours, occasionally climb stairs and ramps, never climb ropes, ladders or scaffolds, occasionally stoop, kneel, crouch, or reach overhead, and should avoid exposure to unprotected heights, could perform any of plaintiffs past work. The VE testified that plaintiff's past work as a meat cutter requires heavy exertional effort, and his past work as a cleaner with a buffing machine requires medium exertional effort. He opined plaintiff could not perform any past work. (Tr. 35-36.)

However, he opined such individual could work as a cleaner, which includes tasks such as dusting, emptying wastebaskets, and rearranging chairs and is unskilled, light work with about 5,800 positions locally and 420,000 positions nationwide. Also, the VE determined such an individual could be an unarmed security guard, which requires standing or walking for a period of time and is unskilled, light work with 1,100 positions locally and 82,000 positions nationwide. (Tr. 36-37.)

The ALJ then presented a hypothetical individual who could lift only 5 pounds frequently, stand and walk less than one hour, and sit one hour. The VE responded that these limitations would not allow the individual to perform any past work or any other work. (Tr. 37.)

Plaintiff's counsel then asked the VE to assume ALJ's first hypothetical, except that such individual could stand and walk for only 2 hours. The VE opined that such individual could perform no light work. (Tr. 37.)

### III. DECISION OF THE ALJ

On June 27, 2012, the ALJ issued a decision that plaintiff was not disabled. (Tr. 10-18.) At Step One of the prescribed regulatory decision-making scheme,[9] the ALJ found that plaintiff had not engaged in substantial gainful activity since September 10, 2010, the alleged onset date. (Tr. 12.)

At Step Two, the ALJ found that plaintiff's severe impairments were obesity and minimal degenerative joint disease of the right knee, right shoulder, and left ankle. (Id.)

At Step Three, the ALJ found that plaintiff had no impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR 404.1520(d). (Tr. 13.)

The ALJ considered the record and found that plaintiff had the residual functional capacity (RFC) to perform light work, which includes lifting and carrying 20 pounds occasionally and ten pounds frequently, standing or walking for six hours out of eight, and sitting for six hours of eight, except that plaintiff could only occasionally stoop, kneel, crouch, climb stairs/ramps, or reach overhead with his right arm. He also found plaintiff could never climb ladders, ropes, or scaffolds and should avoid concentrated exposure to unprotected heights. At Step Four, the ALJ found that plaintiff could perform no past relevant work. (Tr. 13-16.)

At Step Five, the ALJ found plaintiff capable of performing jobs existing in significant numbers in the national economy. (Tr. 16-17.)

---

[9] See below for explanation.

## IV.  GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d at 942. A five-step regulatory framework is used to determine whether an individual is disabled. 20 C.F.R. § 404.1520(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942 (same).

Steps One through Three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment. 20 C.F.R. § 404.1520(a)(4)(i)-(iii). If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform his past relevant work (PRW). Id. § 404.1520(a)(4)(iv). The claimant bears the burden of demonstrating he is no longer able to return to his PRW. Pate-Fires, 564 F.3d at 942. If the Commissioner determines the claimant cannot return to PRW, the burden shifts to the

Commissioner at Step Five to show the claimant retains the RFC to perform other work that exists in significant numbers in the national economy. Id.; 20 C.F.R. § 404.1520(a)(4)(v).

## V. DISCUSSION

Plaintiff argues: (1) the ALJ erroneously assessed his credibility; and (2) substantial evidence does not support the ALJ's RFC assessment.

**A. Credibility**

Plaintiff argues the ALJ made erroneous conclusions when assessing plaintiff's credibility. More specifically, plaintiff argues the ALJ incorrectly found that plaintiff was not prescribed narcotic pain medications, and the ALJ incorrectly found plaintiff not credible because he did not follow through with his orthopedic appointments.

In determining the credibility of testimony and complaints, the adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; (5) functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1321–22 (8th Cir. 1984). The ALJ is not required to discuss each Polaski factor as long as "he acknowledges and considers the factors before discounting a claimant's subjective complaints." Moore v. Astrue, 572 F.3d 520, 524 (8th Cir. 2009) (citing Goff v. Barnhart, 421 F.3d 785, 791 (8th Cir. 2005)); see also Samons v. Apfel, 497 F.3d 813, 820 (8th Cir. 2007) (citing Tucker v. Barnhart, 363 F.3d 781, 783 (8th Cir. 2004) (while the Polaski factors should be taken into account, "we have not required the ALJ's decision to include a discussion of how every Polaski 'factor' relates to the claimant's credibility.") "Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole." Id. "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, we will normally

defer to the ALJ's credibility determination." Juszczyk v. Astrue, 542 F.3d 626, 632 (8th Cir. 2008).

Concerning the frequency, intensity, and duration of the pain, the ALJ determined the plaintiff's subjective descriptions of the impairments were inconsistent with plaintiff's objective medical records. (Tr. 15.) He noted plaintiff had physical impairments that could reasonably be attributed to cause the alleged pain; however, they did not rise to the level alleged by the plaintiff. (Tr. 14.) Plaintiff testified regarding constant pain in his right knee for the past year and a half, but according to his objective medical records, he had no pain in March 2012. (Tr. 29, 227-28.) The ALJ acknowledged that plaintiff testified he had no cartilage in his knee. (Tr. 14.) X-rays taken in January 2011 led to a diagnosis of only minimal degenerative joint disease. (Tr. 221.) The ALJ noted plaintiff alleged a "dropped left foot", but no evidence in the medical records confirms this ailment. (Tr. 14.) The ALJ found that the objective medical evidence, including treatment notes discussing plaintiff's pain level, does not indicate a condition that could reasonably be expected to produce pain of the intensity plaintiff claims. (Tr. 15.) The ALJ also relied on the lack of prescribed narcotic medications and the failure to follow up on orthopedic appointments.

The ALJ found medication improved plaintiff's symptoms. (Tr. 14.) After receiving a steroid injection in June 2011, plaintiff reported some relief. (Id.; Tr. 229.) Despite plaintiff's testimony that his medications made him "dizzy", the medical records contain no complaint of this side effect. (Id.) Furthermore, the treatment notes established plaintiff's pain was "largely well controlled by medication." (Tr. 15, 229, 292.)

First, plaintiff argues the ALJ improperly considered the lack of prescribed narcotic medication in allegations of pain. However, courts have upheld an ALJ's use of lack of narcotic medication in determining the claimant's credibility. See Masterson v. Barnhart, 363 F.3d 731, 739 (8th Cir. 2004); Clevenger v. Soc. Sec. Admin., 567 F.3d 971, 976 (8th Cir. 2009).

The ALJ correctly found plaintiff failed to follow up on his orthopedic appointments. The record shows plaintiff was treated by Dr. Kieffer, an orthopedist, on June 6, 2011. (Tr. 297-98.) However, the record also shows plaintiff had an appointment scheduled for June 29, 2011 with the orthopedic department of Saint Louis Connect Care. (Tr. 295.) Furthermore, plaintiff was told to follow up in three months after Dr. Kieffer's initial examination. (Tr. 298.) Lastly, on March 15, 2012, Dr. Coble ordered plaintiff to consult with an orthopedic specialist. (Tr. 228.) The record does not indicate plaintiff received any further orthopedic consultation beyond the June 6, 2011 consultation with Dr. Kieffer nor does the record indicate any resulting diagnosis. (Tr. 295.) Therefore, the ALJ did not err in finding that plaintiff did not follow up on his orthopedic consultations.

Therefore, the ALJ properly applied substantial evidence to the Polaski factors in order to determine the plaintiff's credibility.

## B. RFC Determination

Plaintiff argues the ALJ's RFC determination is not supported by substantial evidence. Specifically, plaintiff challenges the ALJ's assessment that plaintiff could perform light work, because light work requires "a good deal of standing and walking", which plaintiff argues against.

Plaintiff argues that the ALJ failed to determine plaintiff's RFC based on the medical evidence. However, the ALJ relied on several medical records. First, Dr. Coble's initial findings led to a diagnosis of a probable old rupture with degeneration of the medial meniscus of the knee and degenerative osteoarthritis with calcified loose bodies of the right knee. (Tr. 208.) Plaintiff was then seen by Dr. Varanasi regarding knee pain following a fall down the stairs which led to a diagnosis of minimal degenerative joint disease of the right knee. (Tr. 216-21.) Next, Dr. Kieffer treated plaintiff regarding a broken toe and right knee pain. (Tr. 297-98.) Dr. Kieffer diagnosed plaintiff with osteoarthritis of the knee and injected plaintiff's knee with a corticosteroid. (Tr. 298.)

Plaintiff also argues that the ALJ erroneously discredited Dr. Coble's opinion. The ALJ may credit or discredit the opinions of physicians for legally sufficient reasons, such as whether such opinions are substantiated by any records of medical treatment. Davis v. Shalala, 31 F.3d 753, 756 (8th Cir. 1994); Loving v. Department of HHS, 16 F.3d 967, 971 (8th Cir. 1994).

The ALJ properly determined that the functional restrictions Dr. Coble recommended were inconsistent with the evidence in the medical records. Dr. Coble's medical source statement indicated plaintiff is unable to perform even sedentary exertional level work with additional significant postural, manipulative, and environmental limitations. (Tr. 225-26.) The ALJ wrote, first, that he rejected this opinion because plaintiff testified that the report was made after he told Dr. Coble of his limitations. (Tr. 15, 34.) Furthermore, the restriction of sitting only one hour had no objective medical basis, because at the time of the opinion, plaintiff's only complaint was his right knee. (Tr. 15.) Dr. Coble never connected the knee issue with the inability to sit for longer than one hour. (Id.) Also, plaintiff testified that he could lift fifteen pounds for five to ten minutes at a time; however, the medical source statement created by Dr. Coble indicated plaintiff could only lift five pounds occasionally. (Tr. 33-34, 225.) The ALJ properly applied the Polaski factors in order to determine the plaintiff's credibility and discussed the inconsistencies between plaintiff's testimony and the objective medical evidence. Accordingly, substantial evidence supports the ALJ's credibility determination.

The ALJ's RFC determination was not, as plaintiff asserts, devoid of medical evidence. Once the ALJ lawfully discredited plaintiff's subjective complaints and Dr. Coble's medical source statement, the ALJ used the remaining objective medical evidence in order to determine the RFC of the plaintiff. (Tr. 14-15.) Because the ALJ based his RFC determination on substantial evidence on the record as a whole, plaintiff's argument is without merit.

## V. CONCLUSION

For the reasons set forth above, the decision of the Commissioner of Social Security is affirmed.  An appropriate Judgment Order is issued herewith.

/S/   David D. Noce<br>
**UNITED STATES MAGISTRATE JUDGE**

Signed on  June 11 , 2013.